UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

STEPHANIE PHIFER,                              :
                                               :
                        Plaintiff,             :         MEMORANDUM
                                               :         AND ORDER
            - against -                        :
                                               :         06 CV 3841 (JG)
HOME SAVERS CONSULTING CORP.,                  :
GARTH CELESTINE, PHIL SIMON, WAYNE             :
GRIFFITH, MARVIN BLAKELY and                   :
FREMONT INVESTMENT & LOAN, "JOHN               :
DOE" and "JANE DOE," the last two names being  :
fictitious, said parties being individuals, if any,  :
having or claiming an interest in, or lien upon,     :
the premises described herein, and XYZ-1 CORP.  :
and XYZ-2 CORP., the last two names being      :
fictitious, it being the intention of plaintiff to  :
designate any corporation having a legal interest  :
in the premises described herein,              :
                                               :
                        Defendants.            :
------------------------------------------------------------- X

A P P E A R A N C E S :

        THE LEGAL AID SOCIETY
                120-46 Queens Boulevard
                Kew Gardens, New York 11415
        By:     Oda Friedheim

                        - and -

        SEYFARTH SHAW LLP
                1270 Avenue of the Americas
                Suite 2500
                New York, New York 10020
        By:     Noah D. Lang
                Attorneys for Plaintiff

        REED SMITH LLP
                599 Lexington Ave.
                New York, New York 10022
        By:     Andrew B. Messite
                Attorneys for Defendant Fremont Investment & Loan, Inc.

JOHN GLEESON, United States District Judge:

Stephanie Phifer brings this action claiming that defendants tricked her into transferring the deed to her home and encumbering the property with unwanted mortgages, allegedly keeping most of the proceeds for themselves. Defendant Fremont Investment & Loan, Inc. ("Fremont") has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Phifer's claims that (1) Fremont aided and abetted the fraud perpetrated by the other defendants, (2) Fremont violated New York General Business Law § 349, and (3) Fremont's mortgages on the property should be vacated pursuant to Article 15 of the New York Real Property Actions and Proceedings Law ("the RPAPL claim"). Fremont also moves to dismiss the RPAPL claim pursuant to Fed. R. Civ. P. 12(b)(7) for failure to join a necessary party. For the reasons set forth below, the motion is granted in part and denied in part.

## BACKGROUND

Phifer's amended complaint makes the following factual allegations, which I accept as true for the purposes of this motion.

In April 1999, Phifer bought a one-family house in South Ozone Park, Queens. Compl. ¶ 20. She financed part of the purchase with a $183,450 mortgage from Professional Mortgage Bankers Corp. that was later assigned to Chase Manhattan Bank ("Chase"). *Id.* By March 2003, Phifer had fallen behind on her payments. *Id.* ¶ 21. Chase commenced a foreclosure action against the property, but in August 2003 Phifer and Chase agreed to modify the mortgage and the action was discontinued. *Id.* ¶ 21-22. In October 2004, however, Chase commenced a second proceeding due to Phifer's continued default. *Id.* ¶ 23.

In the summer of 2005, Phifer received flyers from Home Savers Consulting

Corp. ("Home Savers"), one of which was titled: "The Foreclosure Doctor -- We Can Help You Save Your Property and Help You Keep Your Home." *Id.* ¶ 24. Ms. Phifer's mother called the telephone number printed on the flyer and spoke with Phil Simon. She told Simon that Phifer wanted to refinance her mortgage and did not want to lose her home. *Id.* ¶ 25. In a meeting at Phifer's house, Simon said "he could save plaintiff's home by getting her a new loan." *Id.* ¶ 26. He promised to "repair her credit" and "get someone to help her refinance her mortgage." *Id.* ¶ 27.

Phifer's mother instructed Simon "that she did not want her daughter to lose the deed" to the home, to which Simon represented that "without question the title would stay in plaintiff's name." *Id.* ¶ 28. Simon said that Home Savers would accept mortgage payments from Phifer for one year, hold the payments "in escrow" to prove Phifer's good faith and her ability to pay, and help Phifer improve her credit. *Id.*

Phifer alleges that based on these representations she believed Home Savers would "save" her house from foreclosure, obtain an affordable loan, and repair her credit. *Id.* ¶ 29. Phifer and her mother met with Simon two more times. *See id.* ¶ 30-31. The second time, he "reiterated that he would get plaintiff a lower interest rate and that her monthly mortgage payment would be about the same as before based on a new mortgage of about $290,000." *Id.* ¶ 31. Simon also instructed Phifer to file for Chapter 13 bankruptcy to stop the pending foreclosure sale. *Id.* ¶ 32. She complied by signing a bankruptcy petition and a check for $250 at Home Savers's office in Brooklyn. *Id.* ¶ 33.

On August 29, 2005, the closing took place at the offices of Home Savers in Freeport, New York. *Id.* ¶ 34. Simon was present, along with several other people, including

Wayne Griffith, who Simon introduced as a "temporary" buyer of the home. *Id.* ¶ 35. He assured Phifer "this was merely a technicality and not to be concerned." *Id.* ¶ 36. Marvin Blakely, who Phifer had never met before, was introduced to Phifer as "your attorney." *Id.* ¶ 35. Also present were representatives from Fremont and the title company. *Id.*

Blakely then obtained Phifer's signature on several papers "in rapid succession," never "explaining their legal significance, or giving her the opportunity to read any of the papers." *Id.* ¶ 37. Phifer tried to ask questions, but was repeatedly and openly instructed by Simon "not to worry . . . and that he would give her more details later." *Id.* In the presence of the Fremont representative, Simon told Phifer that "she would remain on the title," and, when Phifer noticed two mortgages taken on the property totaling $415,000, "that the new mortgages were just temporary." *Id.* ¶ 37-38. At the end of the closing, Simon said, "Congratulations, you just refinanced your house." *Id.* ¶ 39.

Actually, Phifer had unwittingly signed a document transferring the title to her house to Griffith. *Id.* ¶ 44. Phifer was never given a copy of this document. *See id.* ¶ 40. Phifer had also signed a handwritten disbursement sheet and an agreement titled "Letter of Investors Program Mortgage Agreement," *id.*, both of which she "had trouble understanding," *id.* ¶ 41. The disbursement sheet indicates that Blakely -- Phifer's purported attorney -- received payments for $80,065.47 and $46,065.40 out of the mortgage proceeds. *See id.* ¶ 51. The agreement, on which was written in large letters, "Helping You Keep Whats [sic] Yours," provided, "'[W]hereas for one year our mortgage saving program will pay your mortgage and return properties back to owner/seller on or about *1yr.* It is further agreed that at the time of transfer owner/seller will not incur any financial charges for the transaction of deed and

mortgage.'" *Id.* ¶ 41. The agreement also stated that Griffith, the "buyer of said property, would not have any legal responsibility or right to use or occupy or make any request to [sic] ownership of said property for the one year investment period agreement." *Id.* ¶ 42. Phifer claims that she continued to believe she retained title to her home despite the text of the agreement, in part because that document identified her below her signature as "Property Home Owner" and Griffith as "Property Buyer." *Id.* ¶ 43.

To finance the title transfer, two mortgage loans, for $332,000 and $83,000, were made by Fremont to Griffith. *See id.* ¶ 45. However, the only proceeds Phifer received from the unwitting transfer of title was a check for $19,437, signed by Tom L. Moonis, Fremont's settlement agent. *Id.* ¶ 48-49. This check was never explained to Phifer. *Id.* ¶ 49.

In January 2006, Phifer's mother discovered Phifer's name was no longer recorded on the deed. *Id.* ¶ 57. She contacted Simon, who sent her a "proposal" reflecting a new payoff amount of $430,000. *Id.* ¶ 58.

Phifer concedes that she signed two HUD-1 settlement statements for the two mortgages and took copies of those statements away from the closing. *See id.* ¶ 40. She "now understands" they "purport to set forth the entire transaction" but alleges that she signed the statements "in the belief that they were part of her mortgage application." *Id.* ¶ 45.

Phifer also claims that the HUD-1 statements, which were prepared by Fremont's settlement agent Moonis, "are replete with inconsistencies and misrepresentations." *Id.* ¶ 47. First, the $332,000 loan statement falsely provides that Phifer received $371,000 as seller, whereas in fact she received $19,437. *Id.* ¶ 48-49. Second, the statement included certain "fictional" fees that she claims amount to kickbacks, including an unexplained $19,701.96 fee

for "allowable closing costs," a $17,250 fee to Chateau Properties, an unknown entity, and an approximately $4,000 brokerage fee to Southern Star, another unknown entity. *Id.* ¶ 50. Third, the statements omit that Blakely received two payments, for $80,065.47 and $46,065.40, according to the handwritten disbursement sheet provided to Phifer at the closing. *Id.* ¶ 51. Fourth, the settlement forms list the settlement dates for the $83,000 and $332,000 loans as July 26, 2005 and August 18, 2005, respectively, which dates preceded the actual closing date. *Id.* ¶ 52. Fifth, the listed subject property for the $83,000 mortgage is not Phifer's home but another home, which "public records" reveal was purchased by Griffith for a purchase-money mortgage of $450,000. *Id.* ¶ 53. Phifer claims Moonis knew of these misrepresentations when he prepared the settlement documents. *Id.* ¶ 55.

## DISCUSSION

A.      *The Motion To Dismiss Standard of Review*

A motion to dismiss tests the legal, not the factual, sufficiency of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'" (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)) (prior citations omitted)). Accordingly, as mentioned above, I accept the factual allegations in Phifer's complaint as true, and draw all inferences in her favor. *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir.

2005), *cert. granted*, 126 S. Ct. 2965 (2006). I may not grant Fremont's Rule 12(b)(6) motion

unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle her to

relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Gregory v. Daly*, 243 F.3d 687, 691 (2d

Cir. 2001).

B.      *Aiding and Abetting Fraud*

Under New York law, establishing liability for aiding and abetting fraud requires

proof of (1) a fraud, (2) the defendant's "actual knowledge" of the fraud, and (3) the defendant's

"substantial assistance" to the fraud's commission. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273,

292 (2d Cir. 2006) (citing *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252

(S.D.N.Y. 2005)). Fraud, in turn, requires proof of "a representation of material fact, the falsity

of the representation, knowledge by the party making the representation that it was false when

made, justifiable reliance by the plaintiff and resulting injury." *Id.* at 291 (citing *Kaufman v.

Cohen*, 760 N.Y.S.2d 157, 165 (1st Dep't 2003)) (internal quotation marks omitted). In its

motion papers, Fremont contends that Phifer has failed to allege the first and third elements of

the aiding and abetting claim.

First, Fremont argues that Phifer cannot establish the existence of a fraud because

she has alleged no material misrepresentation at the closing (when the Fremont agent was

present). In particular, Fremont takes Phifer to admit that she "executed the deed transferring the

title to Griffith," that she knew the loans were supplied to Griffith to pay off Phifer's mortgage,

and that she knew Griffith was a "temporary buyer" with title to revert back to Phifer.

Memorandum of Law of Defendant Fremont Investment & Loan, Inc. in Support of Its Motion

To Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(7) ("Fremont Br.") 9. I agree that a

rational factfinder could conclude from the facts alleged in the complaint that Phifer knew (in the sense that she understood) that she had conveyed title to Griffith as "temporary buyer," Compl. ¶ 36, and that the two Fremont mortgage loans to Griffith encumbered the property in question, *see id.* ¶ 38 ("At one point during the closing, Ms. Phifer noticed that two loans were taken out on the property, totaling $415,000 . . . ."). But the facts alleged are also consistent with Phifer's claim that she was provided only glimpses of the paperwork and was hoodwinked by Simon's representations at the closing that (1) she would retain title to the home, *id.* ¶ 37; (2) the new mortgages were "temporary," *id.* ¶ 38; and (3) as a result of the closing she had refinanced her house at a lower interest rate, *see id.* ¶ 38, 31.[1]  I conclude that the complaint sufficiently alleges fraud.[2]

Second, Fremont argues that Phifer has failed to allege Fremont's substantial assistance of the fraud. Substantial assistance can consist of "affirmatively assist[ing], help[ing] conceal, or by virtue of failing to act when required to do so enabl[ing] [the fraud] to proceed." *Winnick*, 406 F. Supp. 2d at 256 (internal quotation marks and citations omitted). Courts equate substantial assistance with proximate cause. *See, e.g.*, *Nisselson v. Ford Motor Co.* (*In re Monahan Ford Corp. of Flushing*), 340 B.R. 1, 34 (Bankr. E.D.N.Y. 2006). *But see Winnick*,

---

[1]  At oral argument, counsel for Fremont made explicit the argument -- only hinted at in Fremont's motion papers -- that Phifer's complaint insufficiently alleges Fremont's actual knowledge of the fraud.  A rational factfinder, however, could easily infer from Fremont's presence at the closing and its status as mortgagee that, having heard these three representations by Simon and knowing their falsity, Fremont knew of the scheme to defraud Phifer of her home and its equity.

[2]  Fremont repeatedly asserts in its moving papers that Phifer's complaint conclusively demonstrates that Phifer actually perpetrated a fraud upon Fremont.  *See, e.g.*, Fremont Br. 2.  The obvious flaw with this argument is that it supposes that I should infer -- from Phifer's signature on the documents of transfer and the HUD-1 settlement statements, from the fact that Phifer was told that Griffith was a "temporary buyer," and from the fact that Phifer noticed the new mortgages at the closing -- that Phifer was not misled by Simon's statements to her.  Such an inference cuts against Phifer, not for her.  It is therefore incompatible with the analysis of a motion to dismiss.

406 F. Supp. 2d at 256 n.6 (expressing "some doubt about whether 'substantial assistance' can be equated with proximate cause"). Fremont points out, correctly, that mere silence cannot support a claim for aiding and abetting fraud absent a duty to disclose. *See King v. George Schonberg & Co.*, 650 N.Y.S.2d 107, 108 (1st Dep't 1996).

Fremont claims its agent merely sat silent at the closing, and, having no duty to disclose, cannot be held to have substantially assisted the fraud as a matter of law. But aiding and abetting liability touches everyone who offers substantial assistance in the fraud -- not just those participants who speak falsely. *See Banks v. Consumer Home Mortgage, Inc.*, No. 01-CV-8508 (ILG), 2003 WL 21251584, at *11 (E.D.N.Y. Mar. 28, 2003) (plaintiffs stated aiding and abetting claim against attorney for defendants who themselves defrauded plaintiffs into buying real estate at an inflated price, but who himself made no misrepresentation at the closing, because as defendants' attorney he "facilitated the commission of the purported fraud at the closing"). Accordingly, Fremont cannot disclaim liability on the ground that it was the financier, not the spokesman, of the fraud. *See Nisselson*, 340 B.R. at 34 (defendant substantially assisted in fraud by extending financing to enable a debtor to fraudulently obtain vehicles). In any event, Fremont made its share of misleading statements to advance the fraud, according to the complaint. The HUD-1 statements, which were prepared by a Fremont agent, contain alleged misrepresentations designed to camouflage the distribution of the bulk of the mortgage proceeds to people other than Phifer (the purported seller). If Fremont in fact financed the sham transaction and participated in the allegedly wrongful distribution of the funds, Fremont substantially assisted the fraud.

In sum, I conclude that Fremont's objections to Phifer's claim of aiding and

abetting fraud are without merit.

C.      *New York General Business Law § 349*

Fremont moves to dismiss Phifer's claim pursuant to New York General Business Law § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  N.Y. Gen. Bus. Law § 349(a); *see also id.* § 349(h) (providing for a private right of action).  "[A]s a threshold matter, plaintiffs claiming the benefit of section 349 . . . must charge conduct of the defendant that is consumer-oriented."  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).  Next, a § 349 claim must allege that "defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof."  *Id.* at 25-26 (citations omitted).  Plaintiff need not allege reliance -- they need only show that the deceptive act caused the injury.  *See id.* at 26; *see also Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000).

First, Fremont argues Phifer has alleged no consumer-oriented conduct.  This argument is without merit.  Plaintiffs must allege conduct that implicates the public interest, something more than a single-shot consumer transaction or a contract dispute unique to the parties.  *See Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 147-48 (2d Dep't 1995).  While the claim need not allege recurring conduct, to prevail the plaintiff "must demonstrate that the acts or practices have a broader impact on consumers at large."  *Oswego*, 85 N.Y.2d at 25.  New York courts also look to the amount of the transaction and the sophistication of the parties to discern whether the parties "need the protection" of the consumer-protection law.  *Teller*, 213 A.D.2d at 147; *see also New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 321 (1995)

10

(plaintiff university did not state § 349 claim against insurer because non-standard policy between knowledgeable corporate actors "tailored to meet the purchaser's wishes and requirements" for coverage up to $10 million was "not conduct which affects the consuming public at large").  Given the liberal standard applicable on a motion to dismiss, Phifer's allegations of Fremont's misrepresentations on the HUD-1 statements pass the test.  I infer from Phifer's statement that Fremont's "practices have had and may continue to have a broad impact on consumers throughout New York State," Compl. ¶ 96, that Fremont has a standard practice of using misleading HUD-1 forms to assist in distributing the equity fraudulently obtained from New York mortgage-holders who seek refinancing.  My inference of this standard practice is supported by the liberal construal mandated by *Conley v. Gibson*, and because § 349 was intended to "afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds," *Oswego*, 85 N.Y.2d at 25 (citation and internal quotation marks omitted).  I also note that Phifer alleges herself to be a relatively unsophisticated market player who "had trouble understanding" documents she was made to sign quickly and with misleading explanations.  Compl. ¶ 41.  Accordingly, I conclude that she is entitled to offer evidence to support her claim pursuant to § 349.

Second, Fremont argues Phifer has alleged no materially deceptive act.  I disagree.  A "materially deceptive act" is one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Oswego*, 85 N.Y.2d at 26.  Under this standard, the HUD-1 statements, prepared by Fremont's agent, were materially deceptive.  Those statements allegedly misrepresented the distribution of the mortgage proceeds by (a) falsely stating that Phifer received $371,000 of the funds, (b) stating fictional disbursements to unknown entities,

(c) omitting two payments to Blakely, and (d) falsely listing the dates of the loans and (in one case) the subject property. *See* Compl. ¶¶ 47-55. To the extent that these statements were false (and I must assume they were), they would materially mislead a reasonable consumer as to the true nature of the real estate transaction.

Fremont counters that "Fremont making a mortgage to *Griffith* hardly constitutes a deceptive act by Fremont towards *Phifer* . . . ." Br. at 7. The intuition behind this argument is that Phifer cannot claim consumer protection from Fremont if she was never taken in by Fremont's deceptive HUD-1 statements. But the protection of § 349 is broader than Fremont supposes. To recover, Phifer need only prove that Fremont's materially deceptive act caused her injury. Phifer can recover even if Fremont's deception was not a necessary condition of her injury, *see Stutman*, 95 N.Y.2d at 29 ("[R]eliance is not an element of a section 349 claim."); *see also id.* at 30 (lender's assurance that borrowers would never be charged prepayment fees, which allegedly was sufficient to cause borrowers to transact with lender and then "to suffer a $275 loss" in the form of an "attorney's fee" when borrowers refinanced the loan, satisfied causation element -- the borrowers "need not additionally allege that they would not otherwise have entered into the transaction"), and even if that injury was "indirect," *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab.*, 175 F. Supp. 2d 593, 631 (S.D.N.Y. 2001) ("[N]o requirement of privity" between § 349 plaintiff and defendant) (citing *Vitolo v. Dow*, 634 N.Y.S.2d 362, 366-67 (Sup. Ct. 1995), *aff'd in relevant part*, 651 N.Y.S.2d 104 (2d Dep't 1996)). Accordingly, even if Phifer yielded her signatures at the closing wholly ignorant of the deceptive statements in the HUD-1 documents, and thus would have entered into the transaction without the statements, and even if she never signed a contract with Fremont, Phifer states a claim so long as she alleges that

the fraudulent HUD-1 statements caused her injury. Phifer has sufficiently alleged such causation, as the equity was stripped from the property at issue by the Fremont mortgages, and the HUD-1 statements provided by Fremont were instrumental to those mortgages and, according to the complaint, to the distribution of the resulting proceeds.

C.  *The RPAPL Claim*

Fremont moves pursuant to Fed. R. Civ. P. 12(b)(7) to dismiss Phifer's RPAPL claim for failure to name a necessary party. Phifer seeks a judgment declaring Fremont's mortgage on the property null and void because, on account of the alleged fraud, Griffith had no valid property interest in the property to convey to Fremont. Fremont claims, however, that it has assigned the mortgages at issue to Barclays Bank, PLC ("Barclays"). *See* Messite Aff. ¶ 9. Plaintiff does not contest that Barclays is a necessary party. Accordingly, I dismiss this claim against Fremont.[3]

CONCLUSION

For the foregoing reasons, I deny the motion to dismiss Phifer's claims that Fremont aided and abetted fraud and violated New York General Business Law § 349, and I grant the motion to dismiss the RPAPL claim.

So ordered.


John Gleeson, U.S.D.J.


Dated: Brooklyn, New York
        January 30, 2007

---

[3]        I need not address now Fremont's additional argument that the claim should be dismissed for failure to state a claim on which relief can be granted.